## L. SCOTT FRANTZ *v.* RUTHERFORD R. ROMAINE ET AL. (AC 25850)

Dranginis, Flynn and Dupont, Js.

Argued October 12, 2005—officially released January 31, 2006

*Philip H. Bartels*, for the appellant (plaintiff).

*Joseph L. Clasen*, with whom, on the brief, was *Christopher J. Major*, for the appellees (defendants).

*Opinion*

DUPONT, J. The plaintiff, L. Scott Frantz, in this declaratory judgment action, appeals from the judgment of the trial court rendered in favor of the defendants, Rutherford R. Romaine and Carol Grey Romaine. The plaintiff claims on appeal that the court (1) failed to follow fundamental principles of the law of contracts relating to simultaneous agreements in reaching its conclusion that an agreement of purchase option signed by the parties is no longer operative, (2) improperly found that the plaintiff waived his rights under that agreement of purchase option and (3) incorrectly con-

cluded that the plaintiff was estopped from asserting any rights under the agreement of purchase option. We affirm the judgment of the trial court.

The court found the following facts. The plaintiff is the resident-owner of 123 Meadow Road in Greenwich. The defendants reside at 131 Meadow Road in Greenwich and own the abutting property at 139 Meadow Road. Specifically, 139 Meadow Road, which consists of four acres, is owned by Rutherford R. Romaine, and 131 Meadow Road, which consists of approximately two acres, is owned by Carol Grey Romaine. The defendants, who are husband and wife, purchased both parcels from common grantors, William H. Strong and Sandra J. Strong, for $3.35 million in December, 1993.[1] The defendants' property is situated on a hill, overlooking both Long Island Sound and the property owned by the plaintiff. The defendants' property has sentimental value to the plaintiff because he grew up there. Only the four acre parcel at 139 Meadow Road is at issue in this appeal.

In 1989, the estate of the plaintiff's mother conveyed both parcels to William H. Strong and Sandra J. Strong. Although the plaintiff did not want to purchase the undeveloped parcel at 139 Meadow Road personally, he wanted the property to remain undeveloped. In October, 1993, after the defendants had agreed to a purchase price with the Strongs, a meeting between the plaintiff and the defendants to discuss the plaintiff's interest in the defendants' purchase of the property was arranged by the selling agent. The defendants informed the plaintiff that they intended to purchase both parcels using a "bridge loan," pending a subdivision for sale of 139 Meadow Road. Although the defendants also preferred to leave 139 Meadow Road undeveloped, they did not

---

[1] The plaintiff testified at the trial that in April, 2004, the four acre parcel alone was worth $9.3 million.

believe that financing for their purchase could be arranged without subdividing and selling 139 Meadow Road.

In an attempt to accommodate all of the parties' wishes, the plaintiff agreed to loan the defendants $1.8 million toward the purchase price of the two properties. On October 28, 1993, the parties reached an agreement concerning the terms of the loan, and a series of documents were prepared by the plaintiff's attorney. At the December 21, 1993 closing, four documents were signed and exchanged: (1) an open-end mortgage from Rutherford R. Romaine to L. Scott Frantz, covering the 139 Meadow Road parcel; (2) a secured promissory note signed by Rutherford R. Romaine and Carol Grey Romaine in the amount of $1.8 million; (3) an agreement of purchase option (purchase option); and (4) an agreement of restrictive covenant.[2]

The promissory note obligated the defendants to pay the plaintiff a portion of the accrued interest, beginning with 20 percent on the first and second anniversary dates and increasing to 66 2/3 percent on the fifth anniversary date, December 21, 1998. The mortgage was a balloon mortgage, which provided for the payment of all principle and accrued interest on December 21, 1999.

The purchase option gave the plaintiff an option to purchase 139 Meadow Road for 95 percent of its fair market value in the event that he gave notice to the defendants of a default on their mortgage or note and they failed to cure the default within sixty days. If the

---

[2] The restrictive covenant prevented development of 139 Meadow Road during the life of the loan, contained a right of first refusal to the plaintiff to buy the property and a potential option to obtain an easement over 131 Meadow Road. The restrictive covenant also provided that the defendants would not construct any building on the four acre parcel or divide it into two lots until either the note was paid in full or the defendants sold the property. The covenant is not directly involved in this appeal. In the present appeal, the purchase option is the document specifically at issue.

plaintiff did not exercise the option within 120 days following default, the purchase option required that the parcel be sold, with the plaintiff being entitled to obtain both payment of the note and accrued interest, as well as 50 percent of the sale price minus $1.8 million, less expenses. The plaintiff's percentage of the profit would increase to 75 percent if the sale occurred more than 540 days after expiration of the purchase option. Paragraph eleven[3] of the purchase option enabled the plaintiff to avoid the remedy of foreclosure by sale, a contingency that would permit 139 Meadow Road to be developed in direct opposition to the plaintiff's wishes.

On December 21, 1993, the date on which the documents were signed, the defendants took possession of the residence at 131 Meadow Road and title to both parcels. On December 22, 1994, January 30, 1996, and February 5, 1997, the defendants made payments of $26,524.11, $33,649.13 and $56,308.57 due under the note. On October 26, 1998, the defendants paid a portion ($40,000) of the payment due on December 21, 1997. The payment due on December 21, 1998, in the amount of $127,010.42, plus the $20,537.83 that remained outstanding from December 21, 1997, was not paid. The

---

[3] Paragraph eleven provides: "Rutherford R. Romaine acknowledges that he has been adequately appraised by his attorney of the following rights ('the Rights') which he would have if a Connecticut foreclosure lawsuit were to be filed against him in respect of the Four Acre Parcel in the event of default under the Note and Mortgage, which Rights include: (i) the right of redemption (i.e., the right to bring the Note current and therefore redeem his interest in the Four Acre Parcel); (ii) any rights he may have pursuant to the unemployed and underemployed persons provisions of the Connecticut foreclosure statutes . . . and (iii) any other rights, by statute or by common law, legal or equitable, arising from or with regard to his status as a borrower/mortgager in connection with the Note and Mortgage. Rutherford R. Romaine . . . agrees that, in lieu of commencing a mortgage foreclosure proceeding against him . . . in the event of a default with regard to the Note or the Mortgage, the Payee (or his assignee) may exercise the Purchase Option pursuant to paragraph 4 hereof or, if he shall not so exercise the Purchase Option, the provisions of paragraph 5 hereof shall apply."

defendants attributed the failure to pay to unexpected business difficulties. The plaintiff and the defendants then began discussing payment of the amount due and the fate of 139 Meadow Road.

On June 11, 1999, the defendants hand delivered to the plaintiff a copy of an application to the Greenwich planning and zoning commission, proposing a lot line revision of the undeveloped parcel. The plaintiff, on the same date, sent a letter to the defendants.[4] The parties are in dispute as to the impact of the letter. Receipt of the plaintiff's letter by the defendants prompted discussions by them with the plaintiff and his attorney.

Those communications resulted in a letter, dated July 9, 1999, from the plaintiff to the defendants. In that letter, the plaintiff reassured the defendants that "[t]he last communication was not intended to cause any pressure, only to guard against the possibility of the property issue becoming more complicated if anything were to happen to you two [the defendants]." The plaintiff further wrote: "We will continue to be flexible and will certainly consider any 'creative' ways to relieve everybody's anxiety . . . ." At trial, the defendants testified that on the basis of the July 9, 1999 letter and assurances obtained from the plaintiff's attorney concerning the plaintiff's desire not to foreclose, they did not take steps to immediately satisfy their obligation to the plaintiff.[5]

---

[4] The June 11, 1999 letter states in part: "[J]ust to guard against the possibility of losing the right to purchase that lot if something were to happen to you, we would like to just for the record enforce the default provision in the original contract."

The plaintiff claimed the correspondence was a default letter, consistent with the purchase option. According to the court, the letter notified the defendants that the nonpayment of the $147,548.25, due on December 21, 1998, represented an "Event of Default" under the note. The June 11, 1999 letter did not specifically reference the purchase option.

[5] During the summer of 1999, the defendants' options included selling 131 Meadow Road and building a home at 139 Meadow Road after the debt was satisfied, using a bridge loan to satisfy their debt, or obtaining a loan from Carol Grey Romaine's mother to satisfy their debt. Trial testimony of the plaintiff was that the four acre parcel is worth $9.3 million.

On December 21, 1999, the date on which the note was due in full, the defendants paid $2,717,622.61 to the plaintiff.[6] After accepting the payment, the plaintiff provided a release of the mortgage but refused, however, to release the purchase option because "[t]he option rights granted in said Agreement of Purchase Option are independent of the mortgage released . . . ."

In count one of the complaint, the plaintiff sought a judgment declaring that the purchase option was still in effect. Essentially, the plaintiff claimed that the purchase option gave him certain rights in the parcel at 139 Meadow Road, notwithstanding payment of the loan principle and all accrued interest and a penalty of $46,329.50 on the date due. Significantly, the plaintiff did not seek to invoke the rights he claimed to have under the purchase option because he did not seek specific performance of it to compel the defendants to sell the parcel and to divide the profits with him. In count two, the plaintiff sought temporary and permanent injunctions, seeking to bar the defendants from engaging in any conduct that was violative of the purchase option. Count three alleged a violation of the Connecticut Unfair Trade Practices Act, General Statutes § 42a-110 et seq. The plaintiff's appeal concerns only count one, the declaratory judgment action.[7]

---

[6] A money order in the amount of $2,671,313.11 was tendered, which included all principal and accrued interest. Although the defendants denied that any penalty was due, they agreed to pay an additional $46,329.50, representing the penalty claimed by the plaintiff.

[7] On September 8, 2004, the court issued a memorandum of decision in which it expressly rejected counts one and three. The plaintiff appealed from the judgment. Because the court failed to address count two expressly, the question arises whether a final judgment was rendered on the plaintiff's complaint. See *Poulin* v. *Yasner*, 64 Conn. App. 730, 732, 781 A.2d 422, cert. denied, 258 Conn. 911, 782 A.2d 1245 (2001); see also Practice Book §§ 61-2, 61-3. After examining the court's memorandum of decision, however, we conclude that the court impliedly rendered a decision with regard to count two. In order for the plaintiff to have been granted injunctive relief on count two, the plaintiff had to prove that the purchase option contract was still

The defendants, in their answer and special defense, alleged that after the payment of the loan principal plus interest and penalties, the plaintiff no longer had any rights under the purchase option. The defendants alleged that the plaintiff's claim was barred by the equitable doctrines of estoppel, unclean hands, waiver and laches, that there was no consideration for extending the purchase option beyond the payment of the debt in full,[8] and that the purchase option merged with the mortgage and that payment of the debt extinguished all rights. The defendants also claimed accord and satisfaction and that the purchase option contained unconscionable penalty provisions rather than a provision for liquidated damages.[9] By way of counterclaim, the defendants raised the following three claims: (1) abuse of process; (2) tortious interference with business expectations; and (3) breach of the covenant of good faith and fair dealing.[10]

In its memorandum of decision, the court, addressing count one of the plaintiff's complaint, found that the purpose of the purchase option was to provide additional security for the payment of the $1.8 million debt, and that, once that debt obligation was satisfied, the document was no longer operative and became unen-

in effect. Once the court found that the purchase option contract was not in effect, a judgment by implication arose that the plaintiff could not prevail on his claims for injunctive relief. See *Union Trust Co.* v. *Jackson*, 42 Conn. App. 413, 416 n.2, 679 A.2d 421 (1996). The plaintiff has not raised any claim on appeal as to the judgment in favor of the defendants on count three.

[8] See footnote 13.

[9] The defendants claim, as an alternate ground for affirmance, that the purchase option constitutes an unenforceable penalty. They argue that if the plaintiff were due between 50 percent and 75 percent of the profit from a sale of the four acre parcel, pursuant to the purchase option, he would receive a windfall of up to $6 million, in addition to the interest and penalty paid on the $1.8 million loan. We need not reach that claim.

[10] The judgment in favor of the plaintiff on the defendants' counterclaim was not appealed by the defendants.

forceable for lack of additional consideration.[11] The court concluded that there was no independent consideration to support the extension of the life of the purchase option beyond the date on which the debt obligation was satisfied. The court next found that the July, 1999 letter from the plaintiff to the defendants, coupled with the other written assurances from the plaintiff and oral statements from his attorney, were sufficient to waive any claim of default pursuant to the June 11, 1999 letter.[12] Furthermore, the court found that the defendants were substantially prejudiced by those assurances because they ceased efforts aimed at paying off their obligation under the note prior to December 21, 1999. In addition, the court found that the plaintiff, as a result of his clear and definite promises, on which the defendants relied to their detriment, was estopped from asserting his rights under the agreement of purchase option. The court rendered judgment that the plaintiff had no title or interest in 139 Meadow Road by virtue of the purchase option and ordered the release of a lis pendens that was previously issued to the plaintiff.

The plaintiff claims that the court improperly failed to apply "the first and second of the simultaneous agreements principles" to the purchase option.[13] Essen-

---

[11] We need not reach the question of whether additional consideration for the purchase option would have been necessary after payment in full of the promissory note in order for the purchase option to remain effective because our interpretation of the documents, as we will discuss, on plenary review, is that the intent of the parties was that the purchase option would terminate on payment in full of the promissory note.

[12] The court noted that waiver in this case depended on a finding of fact, based on the plaintiff's letters and the oral testimony of the plaintiff, the plaintiff's attorney and the defendants at trial.

[13] The plaintiff defines the first principle in his brief as "a fundamental common-law doctrine in the law of contracts as applicable when two instruments are executed as part of the same transaction, which allows the benefit accruing to a party under one of the instruments to be the consideration for a promise made by the party in the other instrument." That principle is recited in 15 S. Williston, Contracts (4th Ed. Lord 2000) § 44.29. Nothing in the court's memorandum of decision disputes that principle. The second

tially, the plaintiff argues that the court improperly construed the agreement of the parties in concluding that the purchase option was no longer operative after the defendants satisfied their obligation. The basic question of this appeal is whether the payment by the defendants of the entire obligation of their mortgage and promissory note extinguished or voided the purchase option. The answer depends on a construction of the purchase option, the other documents, the testimony and exhibits at trial and, in part, on whether the plaintiff waived any rights that the purchase option gave him on his alleged notice of default in payment by the defendants or whether he is estopped to assert such rights, if they are existent.

The parties are not in agreement on our standard of review of the court's construction of the purchase option or of the two letters written by the plaintiff that the court construed as "waivers" in view of the trial testimony. The question is whether the interpretation or intent of the parties to a written agreement is a question of fact, subject to a limited scope of appellate review, or a question of law, which is subject to plenary review.[14] Our appellate case law has not always been

principle, according to the plaintiff, is that the purchase option is a separate contract that did not terminate on the payment in full of the promissory note because the purchase option did not explicitly state that it would terminate. We are unaware of any Connecticut appellate decision that so holds.

[14] Some commentators adhere to the "purist" view that all review by an appellate court is a review of a question of law, which sometimes involves the subsidiary examination of factual determinations to assure that they are supported by fact and reason. C. Tait & E. Prescott, Connecticut Appellate Practice and Procedure (3d Ed. 2000) § 8.8. Others recognize that whether the issues in a lawsuit are referred to as "mixed questions of law and fact," or as legal inferences to be drawn from facts, the issues can be freely reviewed by appellate courts in a plenary fashion. 9A C. Wright & A. Miller, Federal Practice and Procedure (2d Ed. 1995) § 2589, pp. 608–11. Without using the phrase, many cases require the resolution of "mixed questions of law and fact," namely, they include the determination of questions involving both law and fact.

consistent in answering that question, varying the standard of review depending upon the particular circumstances and particular language involved. See *Lavigne* v. *Lavigne*, 3 Conn. App. 423, 427, 488 A.2d 1290 (1985).

The plaintiff claims that the standard of review is plenary whereas the defendants claim it is a question of fact and, therefore, subject to the clearly erroneous standard. Usually the interpretation of an agreement is a search for the intent of the parties. That intent is often manifested by the words of the agreement supplemented by the live testimony of witnesses as to the meaning of the document or the circumstances surrounding the execution of the contract. See id., 427–28. If the intent of the parties, as expressed in the document, is capable of only one interpretation because the language is definitive or unambiguous, particularly when the parties agree it is, plenary review is the standard of review, and the intent of the parties is a question of law. *Alaimo* v. *Beacon Industries, Inc.*, 89 Conn. App. 363, 365, 873 A.2d 1015 (2005). If the intent includes both written language and the circumstances surrounding the execution of a document, the standard of review is a mixed question of law and fact.

"[T]he terms of a contract are to be interpreted and their legal effects determined as a whole." 5 A. Corbin, Contracts (1998) § 24.21, p. 204. "The individual clauses of a contract, however, cannot be construed by taking them out of context and giving them an interpretation apart from the contract of which they are a part." *Levine* v. *Advest, Inc.*, 244 Conn. 732, 753, 714 A.2d 649 (1998); 2 Restatement (Second), Contracts § 202 (2) (1981) (written contract to be interpreted as whole). "When there are multiple writings regarding the same transaction, the writings should be considered together to determine the intent of the parties." (Internal quotation marks omitted.) *669 Atlantic Street* v. *Atlantic-Rockland Stamford Associates*, 43 Conn. App. 113, 123, 682

A.2d 572, cert. denied, 239 Conn. 949, 950, 686 A.2d 126 (1996).

Here, the parties executed the note, the mortgage, the restrictive covenant and the purchase option on the same day. All of the instruments concern the same real property. Furthermore, each of the four instruments involve the plaintiff's $1.8 million loan to the defendants. The several documents also cross-referenced one another. The purchase option, for instance, specifically referred to the promissory note, the obligations of the defendants under it and the mortgage. Finally, all of the instruments involve the same parties. We conclude that the four instruments should be considered together in order to interpret the terms of the contract as to the intent of the parties. See *Mongillo* v. *Commissioner of Transportation*, 214 Conn. 225, 229, 571 A.2d 112 (1990).

A plenary standard of review determines "whether the court's conclusions were legally and logically correct and whether they are supported by the facts appearing in the record." (Internal quotation marks omitted.) *Monetary Funding Group, Inc.* v. *Pluchino*, 87 Conn. App. 401, 406, 867 A.2d 841 (2005). The court's factual findings underlying the defendants' special defenses, many of which rest on equitable doctrines, however, are reviewed pursuant to the clearly erroneous standard. See id., 406. The court in this case did not render its decision regarding intent solely on the written agreement and letters, but also rested its decision on the testimony of the parties, thereby assessing testimonial credibility and the weight to be given that testimony.

The issue of whether the original consideration for the purchase option survived the payment by the defendants of the mortgage deed and note is a mixed question of law and fact. The issues of waiver and estoppel are

subsidiary questions of fact, dependent on all of the surrounding circumstances and the testimony of the parties.

For the purposes of the consideration for the executed documents, the plaintiff takes the position that the purchase option is part of a single agreement and is supported by the same consideration as the other three instruments involved in the transaction. The defendants claim that all of the instruments are supported by the same consideration and, thus, that the purchase option simply is additional security for the repayment of the loan, which became superfluous once the debt was paid. The parties, the trial court and we agree, as the court noted, that there was "no independent consideration" for the purchase option promises in support of that agreement.

The plaintiff argues that no additional consideration was needed to keep the purchase option effective beyond the date of payment in full of the promissory note and the release of mortgage. The lack of additional consideration extending beyond payment in full, however, is not the key to whether the plaintiff's rights under the purchase option terminated with such payment. It is the intent of the parties that is the key. The plaintiff acknowledges that is so by arguing that the intent of the parties was that the purchase option would remain effective after payment in full and cites *Batter Building Materials Co.* v. *Kirschner*, 142 Conn. 1, 110 A.2d 464 (1954), in support of that conclusion. That case, however, is not apposite because it involved a contract that stated that a second document, not signed by either signatory of the main agreement and not on the same date, would govern the intent of the signatories. There were no simultaneous agreements in that case, as there are in this case. The basic question of that case and the present case involves the intent of the parties, not

whether the consideration for all documents involved was the same.

We conclude that the intent of the parties, as found by the court, was that any rights afforded to the plaintiff in the purchase option terminated on payment in full by the defendants of his loan to them. We reject his claim that the first of the "simultaneous agreement principles" of contract law requires a different result.

The plaintiff relies heavily on *Regency Savings Bank* v. *Westmark Partners*, 59 Conn. App. 160, 164–65, 756 A.2d 299 (2000) (*Regency Savings Bank I*), and *Regency Savings Bank* v. *Westmark Partners*, 70 Conn. App. 341, 798 A.2d 476 (2002) (*Regency Savings Bank II*), for what he calls "the second of the simultaneous agreement principles," namely, his view that the purchase option survives the agreement to pay the promissory note because the purchase option does not expressly state that it will terminate on payment of the promissory note and release of the mortgage. We do not agree that either of the *Regency Savings Bank* cases contains such an explicit holding. Further, the factual background of those cases distinguishes them from the matter at hand. In *Regency Savings Bank I*, the original obligor on the mortgage enjoyed the benefit of an exculpatory clause that permitted the mortgagee only to look to the premises mortgaged as security for its debt and therefore left the original obligor free from any claims for deficiency judgment in the event of a foreclosure. *Regency Savings Bank I*, supra, 165. At a later time, the original obligor sought to sell the mortgaged premises to a third party. Id., 162. The note, however, contained an acceleration clause that permitted the mortgagee to accelerate and thereby to call all principal due on any conveyance of the mortgaged premises. Id. In consideration for not accelerating payment, other parties, subject to certain limitations, agreed to guarantee the payment of the note and, in turn, the mortgagee agreed

not to accelerate. Id., 166–67. We reversed the judgment of the trial court, which held that because the original obligor was not obligated to pay the mortgagor any deficiency after foreclosure, neither were the guarantors. We noted that "by agreeing to guarantee the note, the defendant guarantors specifically limited the amount of their liability and that their guarantee allowed the property to be conveyed . . . without acceleration of the note. We concluded that the guarantors should not be allowed to escape the risk of their bargain while receiving the benefit thereof." *Regency Savings Bank II*, supra, 344, citing *Regency Savings Bank I*, supra, 167. The separate guarantee survived the termination of the original obligor's liability because it was undertaken separately and later by fourth party guarantors who received separate consideration for obligating themselves to undertake more liability on the mortgage than the original obligor. Id. *Regency Savings Bank I* and *Regency Savings Bank II* are, therefore, not authority for the plaintiff's claim that the simultaneously executed purchase option between the same parties survived the payment of the mortgage between the same parties. Here, there is no deficiency payment after a foreclosure, all documents were executed simultaneously, and there was no additional consideration.

Taking into account the language of the purchase option, which provided that it was an alternative to a mortgage foreclosure in the event of a default and the testimony of one of the defendants at trial that the intent of the parties was that the loan be repaid within six years, we conclude that the purchase option terminated on payment in full. That intent was clear, without the necessity of an express recitation in the purchase option as to its termination. Pursuant to the language of paragraph eleven of the purchase option, the purchase option was to remain in effect only as long as the plaintiff's right to foreclose existed. The plaintiff's right to

foreclose expired on December 21, 1999, on payment in full. With the expiration of the plaintiff's right to foreclose, any right to future enforcement of the purchase option was extinguished as well. The basic question is the intent of the parties, not whether additional consideration was necessary to keep the purchase option viable.

The rights of the plaintiff arising under the promissory note, mortgage or purchase option arose only if there was a default in payment after notice.[15] The court found that the plaintiff waived such rights. It did so by reviewing the plaintiff's letters and weighing the testimony of the plaintiff's attorney. Waiver is a question of fact. *AFSME, Council 4, Local 704* v. *Dept. of Public Health*, 272 Conn. 617, 622, 866 A.2d 582 (2005). Waiver prevents a party from exercising rights that might otherwise have existed. Id., 623. We conclude that the court correctly found that the plaintiff waived any right he might have had to revitalize the purchase option after payment of the debt.

Waiver is a species of estoppel. Both have roots in equity and may be implied from the acts or conduct of the parties. Id. We conclude that the court correctly found that the plaintiff was precluded or estopped from asserting any rights arising from the purchase option after the payment of the mortgage debt, and that he has waived any rights arising from any default in payment.

The facts found by the court, to support its conclusion of law, were not clearly erroneous. The plaintiff was not entitled to a declaratory judgment as a matter of law declaring that the purchase option "was not termi-

---

[15] The plaintiff never exercised his purchase option to buy the four acre parcel after default within 120 days for 95 percent of its fair market value. Even if we assume, as does the plaintiff, that notice of default occurred on June 11, 1999, the plaintiff made no attempt to buy the parcel at any time before December 21, 1999.

nated or otherwise extinguished, or modified" or that it "remains as a valid and fully enforceable right" of the plaintiff.[16]

The judgment is affirmed.

In this opinion the other judges concurred.

---

[16] The quoted language is the relief sought by the plaintiff in his complaint.